## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROBERT DIEBEL,

      Plaintiff,

v.

L&H RESOURCES, LLC, a Michigan
Limited Liability Company,

      Defendant.

_____/

No. 08-13823
Hon. Gerald E. Rosen
Mag. Donald A. Scheer

## OPINION AND ORDER REGARDING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the
U.S. Courthouse, Detroit, Michigan on
February 17, 2010

PRESENT:     Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Robert Diebel commenced this suit against his former employer,

Defendant L&H Resources, LLC ("L&H"), claiming that L&H discriminated against him

on the basis of age in violation of the Age Discrimination in Employment Act (ADEA),

29 U.S.C. § 621 *et seq.*, and the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp.

Laws § 37.2101 *et seq.*, when the company failed to recall him from layoff status for

several months.  Through the present motion, L&H seeks summary judgment in its favor

on both of Plaintiff's claims.  Plaintiff has responded to Defendant's Motion, to which

Response, Defendant has replied.

Having reviewed the parties' briefs and accompanying exhibits, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in the written record, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Sears's motions "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Robert Diebel, born in 1948, is a retired journeyman bricklayer. From approximately 1992 until his early retirement in March 2008, he was employed by Defendant L&H, a large commercial mason contractor headquartered in Livonia, Michigan.[1] L&H is primarily engaged in masonry projects in metropolitan Detroit, though it is also takes on jobs in out-state Michigan, and portions of Ohio and Indiana.[2] The company employs approximately 250 bricklayers. L&H is a signatory to a collective bargaining agreement ("CBA") with the Bricklayers and Allied Craftworkers Union, Local No. 1 of Michigan ("Local #1"), of which Plaintiff is a member. Local #1 includes

---

[1] Plaintiff sought concurrence to add a related entity, Leidal & Hart Mason Contractors, Inc. as a defendant in this action. L&H declined to stipulate to the addition. Plaintiff subsequently filed a separate suit against Leidal & Hart Mason Contractors, Inc. in state court. That action is still pending.

[2] Masonry work involves the laying of brick, block and stone to various structures such as walls and building facades. There is no specialization among L&H bricklayers as to what type of masonry work they will do. Every bricklayer employed by the company does all types of masonry work, though some testimony in the record suggests that particular foremen have preferences for particular bricklayers, with strengths or weaknesses in different types of masonry work.

five counties in metropolitan Detroit. L&H is also a signatory to CBAs with bricklayer unions in out-state Michigan ("Local #9"), as well as other locals in Indiana and Ohio.[3]

During nearly sixteen years of employment with L&H, Plaintiff was rarely if ever laid off for substantial periods of time. Then, in November 2007, Plaintiff was laid off and not recalled to work for nearly twelve weeks.[4] At L&H, it is typically left up to the job foreman or the field operations superintendent to determine which bricklayers are directly transferred to another job, which are laid off and which will subsequently recalled to work. (Harman Dep. 22:6-17, June 11, 2009.) In this case, Plaintiff was laid off by his foreman, Mark LaFrance. In the months that followed, Plaintiff collected unemployment benefits but continued to call L&H to inquire about whether there was any work for him. Plaintiff states that he called LaFrance "constantly," or about once a week through December, then once in January; and he called Mark Butscher, the field

---

[3] In jobs outside the local metropolitan area, L&H is subject to different local CBAs. Each CBA includes terms governing pension contributions, hiring, wages, hours, overtime and termination of employment. These local CBAs usually also include a requirement that L&H employ a certain percentage of local union members on projects in those areas. Wage rates are usually less than wage rates in the metropolitan Detroit area covered by Local #1. L&H employees from the Detroit region may accept jobs outside metropolitan Detroit subject to local CBA requirements governing wages and benefits.

[4] Previously the same year, Plaintiff was laid off twice: once for three weeks in February 2007, and again for three weeks in April 2007. In both cases, he was laid off by the job foreman, Thomas Burke. Though the stated reason for the layoffs was lack of work, Plaintiff later testified that he believed Burke singled him out to be laid off before the jobs were completed because Burke did not like Plaintiff. (Pl. Dep. 23:23-25:4.) Plaintiff also testified that he believed age motivated those decisions, insofar as Plaintiff's age was connected to the foreman's complaint that Plaintiff was "not producing"–i.e., Plaintiff was not efficiently finishing his work. (Pl. Dep. 35:1-36:10.)

operations superintendent "a couple times." (Pl. Dep. 39:10-18.)[5] Ultimately, in February 2008 after having been on layoff for approximately 100 days, Plaintiff put in for early retirement because he "couldn't live on unemployment [benefits]." (Pl. Dep. 40:20-23.) His retirement became effective March 1, 2008. This action arises from Plaintiff's claims that he was effectively "forced" to take an early retirement because of age-related bias and that as a result his monthly pension check was reduced by several hundred dollars from the amount he would have received had he been able to work until he was eligible to retire with full pension benefits.

Plaintiff's allegations of age discrimination stem first from comments made several months before his November 2007 layoff. When Plaintiff was between jobs in April 2007 he met with Michael Harman, the president and co-owner of L&H. According to Plaintiff, Harman told him that Thomas Burke, a foreman, and Mark Mulka, a sub-foreman, had complained about Plaintiff's workmanship: they believed Plaintiff was "not producing." (Pl. Dep. 25:18-26:1.) Harman later testified at his deposition that he did not recall specifically receiving complaints about Plaintiff's work, "but everybody complains about everything, so I'm sure there's times when people complained about it." (Harman Dep. 20:22-21:2.)[6] Plaintiff further recalled: "[Harman]

---

[5] Although Plaintiff testified that he got "no response" from Butscher, Butscher testified that he spoke to Plaintiff on the phone and told him that "the work was slow at that time." (Compare Pl. Dep. 39:16-23 and Butscher Dep. 17:2-4.)

[6] Mark Butscher testified that in his experience as field operations superintendent he observed Plaintiff's work and never had any problems or concerns with it. (Butscher Dep. 10:23-25, June 11, 2009.) He did however report that Plaintiff may have "slowed

told me that he thought I had gotten too comfortable because I was there for so many years and that he didn't have room for that, that it was turning into a competitive business and he was building a younger company." (Pl. Dep. 26:19-23.) Harman stated that he did not recall saying anything to Plaintiff to that effect. (Harman Dep. 24:16-17; 25:4-5.) Instead, he testified:

> I remember sitting down and talking with [Plaintiff], but I was very sensitive to his needs coming in. He came in a lot and talked, and I don't recall him ever—I don't recall saying anything like, Bob, we're going to build a younger company. We may have talked about bettering our company and him being a part of it. I don't recall saying, a younger company, no.

(Harman Dep. 33:20-25.) Plaintiff claims that Harman also inquired about Plaintiff's plans to retire and told him he was going after younger bricklayers; Harman allegedly said that Plaintiff should "think about getting too comfortable with [his] position." (Pl. Dep. 27:2-14.) Harman later testified, "I don't remember having a discussion about [Plaintiff's plans for retirement]—he may have made mention of it, but I couldn't tell you." (Harman Dep. 24:4-8.)

Following this conversation, Plaintiff was hired to work on a job in Toledo, Ohio. In August 2007 he was transferred to a job Detroit, building corporate headquarters for a company called ITC. There, Plaintiff worked with a crew of roughly ten bricklayers,

---

down" when he reached the end of a job: "Some guys, when they get down to the end of the job they like to, instead of getting it done, they like to slow down, and [Plaintiff] could have done that a few times." (Butscher Dep. 11:23-12:1.) Butscher testified that he had received word from one of Plaintiff's foremen on a few projects in spring 2007 that Plaintiff had "slowed down" in this sense. (Butscher Dep. 11:5-9.)

until he was laid off by the job's foreman, Mark LaFrance, on November 19, 2007.

Although Plaintiff claims that there was still work to be done on the project when he was

laid off, LaFrance explained in his deposition that:

> The vast majority of the job was completed. I hung on to [Plaintiff] longer than most people that were there before him because he is a good bricklayer and we had some fancy things to finish. After those were complete, I was left with two apprentices and my right-hand man, who is a sub-foreman, to lay cap stones for the next several weeks. So, that's who was left after him.

(LaFrance Dep. 12:18-25, June 4, 2009.) At least four ITC crew members who were laid

off from the ITC job around the same time as Plaintiff—Anthony Kubeck (born 1966),

Joel Woodward (born 1981), Chris Darke (1982), and Dennis Hogan (born 1959)—were

either immediately transferred or soon thereafter recalled to work on a new job building

the Conner Creek Academy.[7] At least two of these individuals were recalled to work

because they were specifically requested by a particular foreman. (Butscher Dep. 20:20-

25; 22:3-7.) Meanwhile, others who were laid off from the ITC crew—Donald Crawford

(born 1947) and Christopher Crawford (born 1971)—subsequently spent over 100 days

on layoff.

Plaintiff called LaFrance to ask about available work and specifically inquire

about the Conner Creek Academy job in the weeks that followed. LaFrance told him that

the project involved heavy block work and thus was inappropriate for Plaintiff. Plaintiff

took this to mean that LaFrance was referring to Plaintiff's age. (Pl. Dep. 46:8-47:8.)

---

[7] Although Plaintiff originally claimed that he thought some *newly-hired* bricklayers were also called to work on the Conner Creek Academy project, hire dates for the entire crew show that none were new-hires.

LaFrance later testified that he did not consider recalling Plaintiff to work on the Conner

Creek job because:

> Bob is a self-proclaimed bricklayer.  Bob is a very good bricklayer.  *Bob isn't a very good block layer.*  Depending on that particular job, we had to lay an astronomical amount of block per man, and that is not up [Plaintiff's] alleyway, I guess. . . . That's my opinion.

(LaFrance Dep. 17:10-16) (emphasis added).[8]  Mark Butscher further testified that

Plaintiff was not recalled to work more generally because the company was experiencing

an overall slowdown (Butscher Dep. 17:2-4), and he was under the impression that

Plaintiff had already or would soon retire:  "I thought [Plaintiff] had retired because I

hadn't heard from him.  Usually, an employee that wants to work, they'll call me every

day."  (Butscher Dep. 19:11-13.)[9]

On February 20, 2008, Plaintiff filed a complaint with the Equal Employment

Opportunity Commission (EEOC).[10]  The EEOC did not make a determination as to the

merits of Plaintiff's claims; instead, the Commission terminated its investigation

"because efforts to conciliate this matter under Section 7(d) of the ADEA have been

unsuccessful."  (Pl. Resp. Ex. M.)  It issued a right-to-sue letter on June 9, 2008.  Plaintiff

---

[8] LaFrance later clarified that Plaintiff "laid a fine block," but "whether it was . . . 1986, 1976, or 2007, Bob was the same guy . . . . he could never lay *a lot* of block."  (LaFrance Dep. 17:24-18:5) (emphasis added).

[9] Joel Woodward, a fellow bricklayer, testified at deposition that Plaintiff also told everyone at the ITC project that he planned to collect unemployment for a few months then retire.  (Woodward Dep. 22:17-23:1, June 4, 2009.)

[10] Plaintiff did not avail himself of the grievance procedures available to him as a member of the union under the CBA because he claimed he did not know that such procedures existed.  (Pl. Dep. 8:2-4.)

filed the instant action on September 5, 2008, alleging age discrimination. Specifically, he argues that L&H laid him off and did not recall him to work because of his age. In support of this contention, he cites the foregoing incidents and further alleges that L&H did not actually experience a work slowdown since the company was filling positions on over 30 jobs in late 2007 and early 2008 while Plaintiff was waiting to be recalled from layoff status. Plaintiff further alleges that at least some of the jobs available during the at-issue time period were staffed by employees from non-local unions or new hires. L&H counters that Plaintiff cannot satisfy his burden of proof where: (1) Plaintiff was never actually terminated; and (2) L&H experienced an actual work slow down due to the economic downturn, resulting in a work force reduction. The company is now smaller, but maintains essentially the same age profile, with roughly the same percentage of employees aged 50 to 59. Plaintiff retired on March 1, 2008, effectively ending any possibility of being recalled from layoff status.

## III. ANALYSIS

### A.     Legal Standard – Rule 56(c)

Through the present motion, L&G seeks summary judgment in its favor on each of Plaintiff's claims. Summary Judgment under Rule 56(c) of the Federal Rules of Civil Procedure is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the non-moving party. Pack v. Damon Corp., 434 F.3d 810, 813 (6th Cir. 2006). Yet, the non-moving party "may not rely merely on allegations or denials in its own pleading," but "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." Pack, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.      Standards Applicable to Age Discrimination Cases Under the ADEA**

The ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "The ultimate question in every employment

discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Schoonmaker v. Spartan Graphics Leasing, LLC, No. 09-1732, — F.3d —, 2010 WL 364185, at *2 (6th Cir. Feb. 3, 2010) (citing Geiger v. Tower Automotive, 579 F.3d 614, 620 (6th Cir. 2009)).

A plaintiff may establish a violation of the ADEA in one of two ways: direct or circumstantial evidence. See Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). It is evidence "from the lips of the defendant proclaiming his or her animus." Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998) (internal quotation and citation omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a fact-finder to draw a reasonable inference that discrimination occurred." Geiger, 579 F.3d at 622 (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). The Supreme Court recently held that under either method of proof, the burden of persuasion remains on the ADEA plaintiff to show that "age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Financial Services, Inc., — U.S. —, 129 S. Ct. 2343, 2351 (2009).[11]

---

[11] Until recently, the Sixth Circuit applied the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981), in both direct evidence and circumstantial evidence ADEA claims. Geiger v. Tower Automotive, 579 F.3d 614, 621 (6th Cir. 2009) (citing Laderach v. U-Haul of Nw. Ohio, 207 F.3d 825, 829 (6th Cir.

## C. Plaintiff Cannot Make Out His Claim of Age Discrimination.

### 1. Direct Evidence

Plaintiff fails to offer direct evidence that supports his age discrimination claim. He offers no evidence that connects L&H's failure to recall Plaintiff from layoff for several months in December 2007 and early 2008 to Plaintiff's age. Instead, Plaintiff cites Harman's comments at the April 2007 meeting that he was interested in building a younger company, Harman's inquiries into Plaintiff's plans to retire, and LaFrance's comment that Plaintiff would not want a heavy block job. Even if such statements were made, they do not constitute direct evidence of age discrimination.

A statement proffered as direct evidence of age-based bias must not be "isolated, ambiguous, or abstract" and must be a remark "by the employer." Wharton v. Gorman-Rupp Co., 309 Fed. Appx. 990, 995 (6th Cir. 2009). "A discriminatory comment is attributable to the employer when it is made by a 'decision maker.'" Id. at 995-96 (citing Coburn v. Rockwell Automation, Inc., 238 F. App'x 112, 118 (6th Cir. 2007) (noting the "vital difference" between discriminatory statements by corporate decision makers and "stray remarks" by personnel who are unrelated to the decision making process).

---

2000)). However, in Gross the Supreme Court held that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." Gross, 129 S. Ct. at 2352. The Sixth Circuit later clarified that "Gross overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination," but that courts in this circuit should continue to apply the burden-shifting framework when a plaintiff relies on *circumstantial evidence*. See Geiger, 579 F.3d at 621-22 (6th Cir. 2009); see also Gross, 129 S. Ct. at 2351 n.4.

"Statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden . . . of demonstrating animus." <u>Geiger</u>, 579 F.3d at 620-21 (internal citations and quotations omitted). Comments that directly concern the specific hiring decision at issue, or comments from a person that witnessed all or most aspects of the hiring process, may also be direct evidence of age discrimination, even if the speaker did not himself have a hand in the decision. <u>Wharton</u>, 309 Fed. Appx. at 996.

Here, Plaintiff has presented no evidence that Harman was involved in the decision to lay Plaintiff off. Harman testified that although he possessed the general authority to hire and fire employees, it was not his practice to hire and fire non-management employees—i.e., bricklayers. Decisions as to which bricklayers were laid off and recalled from layoff were squarely within the superintendent and foremen's purview. In addition, Mark Butscher, the superintendent who oversees which employees are recalled to work, testified that Harman never spoke to him about Plaintiff or about a general interest in hiring younger employees. Thus, although Harman was a "decisionmaker" within the company in the general sense, the record does not support the inference that he was in any way linked to the decision not to recall Plaintiff or that he even witnessed all or part of the hiring decision at issue. Plaintiff's claims are also significantly weakened by the fact that Harman made the alleged offending remarks in April 2007, *after* which Plaintiff was hired to work on two more jobs lasting almost seven

months, before being laid off.  Harman's general statements, even if taken as true, appear

to be isolated remarks, unrelated to the staffing decisions made over a half-year later.

Harman's questions about Plaintiff's plans for retirement are similarly insufficient

to constitute direct evidence.  In Ercegovich v. Goodyear, 154 F.3d 344 (6th Cir. 1998),

the Sixth Circuit explained that while some employer's comments about retirement may

well be relevant to a showing of age discrimination, overall courts should take a flexible

approach to assessing the relevancy of age-related remarks: "[T]he courts must carefully

evaluate factors affecting the statement's probative value, such as 'the declarant's position

in the corporate hierarchy, the purpose and content of the statement, and the temporal

connection between the statement and the challenged employment action[.]"  Id. at 357

(citing Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997)).  In this

case, although Harman held a top position in the L&H hierarchy, and made the alleged

comments about Plaintiff's retirement in the context of a conversation about Plaintiff's

place at the company, there is virtually no temporal connection between his alleged

queries and Plaintiff's subsequent layoff.  Plaintiff nevertheless argues that Harman's

questions about retirement *prove* the existence of age-related bias without requiring any

inferences.  In support of this argument, he cites Wharton v. Gorman-Rupp Co., 309 Fed.

Appx. 990 (6th Cir. 2009).  Wharton is inapposite here: in that case, the plaintiff, Sharon

Wharton, sued her former employer claiming that the employer's rejection of her

application for a position of executive administrative assistant was motivated by age-

based discrimination.  Id. at 991.  Wharton based her claim in part on allegations that:

Approximately two months after her interview, . . . [the vice president for human resources] told her that, although she performed very well at the interview, [the employer] did not select her for the position because "[w]e were looking down the road, we wanted longevity." She then allegedly asked what he meant by "longevity." [The vice-president] purportedly responded that "[w]e're both baby boomers," asked how old she was and how much longer she had to work before she retired, and remarked that she would be retiring "before too long" and that the company "went with a younger person."

Id. at 992. The employer asserted that Wharton's eminent retirement was one of the bases for its decision not to hire her. Id. In the present case, Harman's alleged comments were both far more ambiguous and they were not made in the context of a discussion about a specific hiring decision. Instead, they were made a full half-year before Plaintiff was laid off. In addition, there is no evidence that Harman had any direct knowledge of the circumstances surrounding Plaintiff's layoff beyond the general understanding that work was slowing down. Finally, given the good relationship Plaintiff appeared to have with L&H management, it seems far likelier that any queries about Plaintiff's long-term plans were "more of a friendly inquiry than a covert attempt to force retirement." Woythal v. Tex-Tenn Corp., 112 F.3d 243, 247 (6th Cir. 1997).

Last, Plaintiff's allegation that LaFrance's comments about the heavy block job constitute direct evidence is inaccurate. As the Sixth Circuit has explained, "[m]ere personal belief, conjecture and speculation are insufficient to support an inference of age discrimination." Woythal v. Tex-Tenn Corp., 112 F.3d 243, 247 (6th 1997). Here, Plaintiff provided only his own opinion as to why LaFrance did not think the Conner Creek Academy job was appropriate for Plaintiff: "The last time I talked to [LaFrance] he

said it was a heavy-block job and I didn't want to be there anyway. *Meaning because of my age*, just too heavy of a job." (Pl. Dep. 46:8-10) (emphasis added). Apart from Plaintiff's personal belief, there is no evidence in the record that LaFrance actually told Plaintiff that the Conner Creek Academy job was unavailable to him because of Plaintiff's age. On the contrary, LaFrance clearly indicated that he did not choose to transfer Plaintiff directly to the next job or later recall him from layoff because he considered Plaintiff inefficient at laying block, and the job required an employee that could lay a lot of block in a limited period of time. Thus, LaFrance's statement that Plaintiff would not want to work on the Conner Creek Academy job is not direct evidence of age discrimination.

### 2. Circumstantial Evidence

As outlined above, in the absence of direct evidence of age discrimination, a plaintiff may make a claim by circumstantial evidence. Under this method, the Title VII burden-shifting framework applies. Schoonmaker, 2010 WL 364185, at *2. Thus, to make out a *prima facie* case, the plaintiff must first show that: (1) he was a member of the protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) either he was replaced by a person outside the protected class, or he was treated differently than a similarly situated non-protected employee. Mickey v. Zeidler Tool and Die Co., 516 F.3d 516 (6th Cir. 2008). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. Martin v. Toledo Cardiology

Consultants, Inc., 548 F.3d 405, 410 (6th Cir. 2008) (citing Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997)).  Once the defendant meets this burden, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."  Id. at 410-11 (citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1083 (6th Cir.1994)).

### i. *Prima Facie* Case

L&H does not dispute that Plaintiff can satisfy the first and second elements of a *prima facie* case of age discrimination.  Plaintiff was over 40 years old at the time of the events in this case and, thus, he was a member of the protected class.  Plaintiff also satisfies the second criterion in that L&H foremen and the superintendent generally acknowledged that Plaintiff was qualified as a bricklayer.  The parties do, however, dispute that Plaintiff satisfied the third and fourth elements, i.e., whether Plaintiff suffered an adverse employment action, and whether he was replaced by a younger worker or treated differently from similarly situated, non-protected employees.

First, the Court evaluates whether L&H's failure to recall Plaintiff from layoff constituted an adverse employment action.  L&H argues that because Plaintiff was never "forced" to retire, he cannot satisfy this element.  "An employer's decision to discharge an employee is a classic example of an adverse employment action."  Vincent v. Brewer Co., 514 F.3d 489, 495 (6th Cir. 2007).  The Sixth Circuit has also held that an employer's decision to lay off an employee and never recall her may also constitute an adverse employment action, even if the layoff is not technically the same as termination

or discharge. Id. at 494-95. In Vincent, the Court found even though the laid off employee was not formally terminated, there was no question that the employer made the initial decision to lay her off, and that this decision was "adequate to satisfy the requirement of an adverse employment decision." Id. at 495. In this case, the parties do not dispute that Plaintiff was laid off from the ITC job in November, and that he was not recalled in the months that followed. Therefore the Court finds, as the Sixth Circuit did in Vincent, that being laid off from a job is sufficient evidence of an adverse employment action to satisfy the third element of a *prima facie* age discrimination case even if there is a possibility that the employee may eventually be recalled to work.

The Court next turns to whether Plaintiff has shown that he was either replaced by a person outside the protected class, or treated differently than a similarly situated non-protected employee. In Barnes v. GenCorp Inc., 896 F.2d 1457 (6th Cir. 1990), the Sixth Circuit held that when work force reductions by the employer are a factor in the adverse employment decision, the fourth element of the McDonnell Douglas test is modified to require the plaintiff to provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Id. at 1465. The Barnes Court further explained that

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced

only when another employee is hired or reassigned to perform the plaintiff's duties.

Id.

In this case, L&H has asserted that work force reductions played a role in the decision not to recall Plaintiff from layoff for several months. In support of this argument, L&H supplies the affidavit of Brad Leidal, the secretary and treasurer of L&H, who attests that for the three months following November 2007 the workload in the Detroit area for L&H-employed bricklayers was reduced by 14.2%, 9.2%, and 39.7% respectively. (Leidal Aff. ¶ 9.) Leidal further states that after analyzing the L&H workforce according to age, "[t]he percentage of bricklayers employed by L&H, *even with the reduction in staffing from calendar year 2007 through calendar year 2008*, remains unchanged at (in [Plaintiff's] age category) 18% of the total bricklayer number of employees." (Leidal Aff. ¶ 10.)[12] In opposition, Plaintiff provides his own analysis of

---

[12] Leidal also cites two charts, which show an overall decrease in monthly contractor hours from 13,122 in October 2007 to 6,071 in March 2009, (Def. Mot. for Summ. J. Ex. 9), and show that the company went from having 152 bricklayers working in October 2007 to 72 bricklayers working in March 2008 (Def. Mot. for Summ. J. Ex. 11). These charts—Exhibits 9 and 11—along with Exhibit 10, a chart of monthly hours logged for January 2006 through May 2009, are unauthenticated summaries of payroll accounting documents. Rule 56(e) of the Federal Rules of Civil Procedure mandates that affidavits or other matters supporting a motion for summary judgment must contain *admissible* evidence. Admissibility is determined according to the Federal Rules of Evidence. Documents that do not satisfy this requirement must be disregarded. Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 532 (6th Cir. 2002). Plaintiff argues that these charts are inadmissible. The Court agrees.

L&H counters that the charts are admissible as summaries of voluminous writings (i.e., 1,200 pages of documents produced by L&H during discovery), pursuant to Rule 1006 of the Federal Rules of Evidence. However, under Rule 1006, a summary must be "accurate, authentic and properly introduced before it may be admitted into evidence."

L&H's personnel data for the period Plaintiff spent on layoff, concluding that there were at least 32 active job sites between November 20, 2007 and March 1, 2008. This does not refute the evidence that L&H was experiencing a slowdown in *overall* contract hours worked and as a result reduced the number of bricklayers actively on a job. Even if L&H continued to operate jobs during the period at issue, Leidal's testimony that L&H actually reduced its active workforce remains uncontroverted. The Court thus finds that work force reduction was a factor in the decision to lay Plaintiff off and to keep him on layoff for several months. Plaintiff must accordingly present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Barnes, 896 F.2d at 1465.

---

Martin v. Funtime, Inc., 963 F.2d 110, 115-16 (6th Cir. 1992) (quoting United States v. Scales, 594 F.2d 558, 563 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S. Ct. 2168 (1979). Neither the charts nor the underlying documents have been properly introduced, since L&H has proffered no foundation for either. Even if the company produced the underlying payroll accounting documents in discovery and Plaintiff did not question their admissibility at that time, as Plaintiff points out, documents obtained through discovery do not automatically become part of the summary judgment record. See Hoffman v. Applicators Sales & Services, Inc., 439 F.3d 9, 14-15 (1st Cir. 2006) (affirming exclusion of chart purporting to summarize data disclosed during discovery where the data itself was never introduced into the summary judgment record). Moreover, the Court is unable to assess the reliability or authenticity of the summarizing charts, even if the underlying documents would be admissible at trial. The preparer of the charts is not named and the exhibits do not reference any range of pages in the underlying accounting documents. Unlike the summarized personnel records in Martin, which were compiled by compliance officers who testified to their accuracy and authenticity, there is absolutely no foundation from which the Court could evaluate the charts' admissibility. Accordingly, the Court will not consider them as part of the summary judgment record. Leidal's affidavit however is admissible.

Plaintiff argues that other similarly-situated bricklayers were treated more favorably than Plaintiff because L&H had several opportunities to recall Plaintiff to work, but instead opted to hire other bricklayers who were substantially younger than Plaintiff.[13]  In support of this contention, Plaintiff relies primarily on his own cross-reference of L&H's personnel information report, which provides the age and hire date for L&H employees, with job labor reports for the period of Plaintiff's layoff (November 19, 2007 through March 1, 2008).  (Pl. Resp. Ex. K.)  Specifically, Plaintiff analyzes 34 jobs where he claims L&H "could have assigned plaintiff to work, but refused to do so." (Pl. Resp. 10.)  The resulting chart lists almost all employees staffed on projects during the relevant months who are at least seven years younger than Plaintiff, i.e., born in 1955 or later.[14]  Plaintiff does not include bricklayers born before 1955 who were staffed on

---

[13] In the Sixth Circuit, an age difference of more than six years is considered "substantially younger."  Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003).

[14]  The Court questions Plaintiff's methodology in compiling this cross-reference chart. Plaintiff appears to include some employees hired outside the relevant period, i.e., those hired after Plaintiff's effective retirement on March 1, 2008.  (See Pl. Resp. Ex. K at pp. 3, 4, 7, 10, 12, 14, 15, 17, 18.)  He also includes some bricklayer apprentices in his tally, though apprentices are generally paid significantly less than journeyman bricklayers and are thus not similarly situated.   (See Pl. Ex. K. at pp. 3, 4, 9, 10.)  In other places, Plaintiff inexplicably omits certain employees: for example, for the out-state job entitled "Ashley Terrace" in Ann Arbor, Michigan, Plaintiff's chart lists only one employee while the job records report indicates that at least seven bricklayers (including a sub-foreman, and two employees of similar ages to Plaintiff) were staffed on that job.  (See Pl. Resp. Ex. K at p. 10.)  While there may have been a certain logic to compiling the cross-reference chart in this way, the Court is unable to decipher exactly what that logic was. Finally, the Court notes that the task of deciphering the chart is complicated by the fact that it is not organized alphabetically by job title or otherwise arranged in the order in which the jobs appear in the L&H records.  And within each job on Plaintiff's chart

multiple jobs during the disputed period. Plaintiff argues that the chart "reveals" that "[t]here were at least 32 jobs during the at-issue time period that defendant could have assigned plaintiff to work, but refused to do so." (Pl. Resp. 10.) Plaintiff further argues that of those 32 jobs, 22 were within the Local #1 jurisdiction though some employed bricklayers from outside locals.[15] Finally, Plaintiff notes that, across all 32 jobs, there were at least 178 instances in which a substantially younger bricklayer was employed.

Although the foregoing evidence indeed shows that Plaintiff *could* have been recalled but was not, it does not establish that Plaintiff was "singled out" to stay on layoff because of his age. The data selected by Plaintiff indicates that work was ongoing for a subset of L&H employees. However, further information provided by L&H indicates that during the same period over 80 bricklayers were laid off. (See Def. Answers to Plaintiff's Third Set of Interrogs.) Within that group, at least 46 bricklayers remained on layoff for over 100 days, i.e., longer than Plaintiff. And well over half of those 46 were substantially younger than Plaintiff, born in 1955 or later.[16] Among Plaintiff's fellow Local #1 journeyman bricklayers, some stayed on layoff for up to six months before

---

employees are not listed alphabetically, nor are they listed in any apparent order by age or union affiliation.

[15] Notably, Plaintiff does not claim that L&H in any way violated the terms of the CBA by hiring outside the Local #1 union, or outside the controlling local in out-state or out-of-state jobs. The CBAs only mandate that a certain percentage of crew-members on any given job be drawn from the controlling local.

[16] At least forty-six of the employees who were laid off during this period were outside the protected class: that is, younger than 40 years old.

being recalled, while still others had still not been recalled to work at the time L&H

compiled the information. For example,

- Eric Benedict (born 1976) was laid off on September 26, 2007 from the ITC project as it was winding down. There was no record of him ever being recalled.

- Christopher Crawford (born 1971) was laid off on November 20, 2007 from the ITC project as it was winding down. No other work was available at that time. He was recalled over 160 days later on April 30, 2008 at the request of a particular foreman.

- Donald Crawford (born 1947) was laid off on January 2, 2008 from the University of Michigan Mosher Jordan project when it was slowed due to winter conditions. No other work was available at that time. He was recalled over 200 days later on August 6, 2008.

- Gustavo Gonzales (born 1970) was laid off on September 25, 2007 during a temporary lull in the Greektown Casino jobsite. He was recalled over 200 days later on April 14, 2008.

- Cecil Hogan (born 1960) was laid off from a project in Ann Arbor on October 5, 2007. There was no record of him ever being recalled.

- Jason Kuehl (born 1973) was laid off on December 14, 2007 from a project in Mt. Clemens, Michigan. There was no record of him ever being recalled.

- Todd McGill (born 1969) was laid off on December 11, 2007 from a job in Brandon, Michigan. There was no record of him ever being recalled.

- Martin Mihelcich (born 1969) was laid off on September 27, 2007 from a project in Mt. Clemens, Michigan. There was no record of him ever being recalled.

- Jeff Reeves (born 1972) was laid off on November 29, 2007 from the Motor City Hotel project. There was no record of him ever being recalled.

- Robert Robinson (born 1966) was laid off on October 19, 2007 from the Motor City Valet parking project. There was no record of him ever being recalled.

- Kirk Schnettler (born 1962) was laid off on December 14, 2007 from a project in Mt. Clemens, Michigan. He was recalled to work on an elementary school

building project over 160 days later on May 26, 2008, at the request of the project's foreman.

- David Walley (born 1962) was laid off on September 28, 2007 from the Greektown parking structure project. There was no record of him ever being recalled.

- Jimmy Williams (born 1957) was laid off on November 16, 2007 from a project in Macomb, Michigan. There was no record of him ever being recalled.

(See Def. Answers to Pl.'s Third Set of Interrogs.) In light of the foregoing, the record simply does not support the assertion that Plaintiff was singled out or treated less favorably than other younger bricklayers. Even though Plaintiff has provided statistical evidence that a subset of L&H employees continued to work during the relevant period, layoff data combined with uncontroverted testimony from L&H employees regarding an overall lull in available work indicates that bricklayers of different ages were laid off from across the L&H workforce for as long as or longer than Plaintiff.

Plaintiff also argues that he established the fourth element of the *prima facie* case by showing that L&H transferred or recalled at least four other similarly-situated, but substantially younger bricklayers, from the ITC jobsite. This argument fails as well. The Sixth Circuit has explained that in analyzing the treatment of similarly situated employees, the question is whether the plaintiff has "demonstrate[d] that he or she is similarly-situated to the non-protected employee in all relevant respects." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 522 (6th Cir. 2008) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998). This Court evaluates whether a non-protected employee is "similarly situated" by considering "the skill, effort,

and responsibilities of each job and the working conditions under which each job is performed." Id. (quoting Conti v. Universal Enter., Inc., 50 Fed. Appx. 690, 699 (6th Cir. 2002)). Plaintiff argues that the evidence showing that Kubeck, Woodward, Darke and Hogan (all of whom were at least seven years younger than Plaintiff) were immediately transferred to other jobs or recalled from layoff status within a few months satisfies the fourth element. He argues that these individuals were "similarly situated" because they all answered to the same company boss, all were bricklayers under the same CBA, and none had complaints about the quality of their work. However, the record indicates that while Plaintiff was a fine bricklayer and capable of laying block, he was considered an *efficient* block layer. LaFrance specifically testified that he needed workers who could lay a lot of block quickly for the Conner Creek Academy job, to make the most efficient use of his crew. He testified that he did not believe Plaintiff was such a bricklayer, though he would have been a good candidate for a job that required "fancy brickwork." Therefore, although Plaintiff makes much of the fact that all bricklayers in Local #1 are qualified to do all kinds of masonry jobs, he has failed to show that the four employees who were selected to be directly transferred or recalled after leaving the ITC jobsite were "similarly-situated" in that they all had the same level of *skill* for the particular job in question.

Finally, Plaintiff argues in the alternative that Harman and LaFrance's ageist comments (asking about Plaintiff's retirement plans, saying that heavy block work was inappropriate for Plaintiff) are sufficient circumstantial evidence to satisfy this fourth

prong.  The Court disagrees.  As discussed above, there was virtually no temporal connection between Harman's alleged comments and the ultimate layoff.  Furthermore, LaFrance made no explicit ageist comment; instead he stated that Plaintiff was not well-suited for a particular kind of job.  Plaintiff's subjective interpretation of these statements as reflecting age-bias is insufficient to serve as circumstantial evidence under the fourth prong.  The Court therefore finds that Plaintiff has failed to provide "additional evidence" as required in a workforce reduction age discrimination case.  He has failed to establish his *prima facie* case.

## ii.    **Pretext**

Even assuming Plaintiff satisfied the *prima facie* elements of an age discrimination claim, he cannot show that L&H's proffered reasons for laying him off and failing to recall him were pretext for age discrimination.  That is, Plaintiff has not shown that L&H's proffered reasons—a general lack of work, Plaintiff's inefficiency at laying block, and the belief that Plaintiff planned to retire—(1) were false or had no basis in fact; (2) did not actually motivate L&H's decision; or (3) were insufficient to motivate the employer's decision.  Wexler, 317 F.3d at 576.  Nor has Plaintiff shown that L&H's proffered reasons were so unreasonable as to give rise to an inference of pretext.  See Schoonmaker, 2010 WL 364185, at *7 (citing Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 553, 558 (6th Cir. 2009)).   In opposing a motion for summary judgment, Plaintiff must produce sufficient evidence from which a jury could reasonably reject L&H's reasons for laying him off and failing to recall him.  Id. (citing Chen v. Dow Chemical

Co., 580 F.3d 394, 400 (6th Cir. 2009) ("Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?")).  The Court finds that Plaintiff has failed to satisfy this burden of production.

Plaintiff makes three arguments why L&H's proffered non-discriminatory reasons are not credible: (1) L&H did not actually experience a slowdown in work flow; (2) L&H cannot site particularized evidence which substantiates *why* it made its decision; and (3) L&H stated in its answer to Plaintiff's first set of interrogatories that it "has no information" to explain why Plaintiff, in particular, was selected for layoff.  Plaintiff also argues that L&H has asserted shifting or changing reasons for its employment decision, which itself proves that the reasons are pretextual.  It is well-settled that a court "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so."  Gray v. Toshiba Am. Consumer Prods., 263 F.3d 595, 600 (6th Cir. 2001).  The record here does provide a basis for the Court to reject L&H's reasons.

First, as discussed above, Plaintiff's attack on the factual basis of the lack of work reason is unavailing.  Even without the disputed charts—Exhibits 9, 10 and 11, addressed *supra* in Note 12—multiple L&H employees testified from personal knowledge about the company's overall decrease in workload during the last quarter of 2007 and the first quarter of 2008.  L&H also submitted a list of over 80 employees who were laid off during the same period as Plaintiff's layoff.  Plaintiff's analysis of job report information showing that L&H continued to have over 30 active jobs, along with his own vague testimony that L&H had "tons of work," do not rebut this evidence—it merely shows that

some work continued through the downturn and that L&H staffed those jobs with employees other than Plaintiff.[17]

Next, Plaintiff's argument that L&H cannot site particularized evidence which substantiates why it made its decision completely glosses over the express testimony of Mark LaFrance who worked with Plaintiff several times before acting as his foreman on the ITC job in November 2007. As discussed above, LaFrance testified that he reduced his crew on the ITC project to a skeleton crew as the job wound down. He laid Plaintiff off because the fancy brickwork was completed or nearing completion. He then did not recall Plaintiff to work on the next project because it was his assessment that Plaintiff is a talented bricklayer, but does not lay block efficiently. This testimony is clearly sufficient to explain why Plaintiff was not recalled specifically to work on the Conner Creek Academy job. While Plaintiff is correct to point out that an employer may not merely state that it based its adverse employment decision on which employee it considered to be "best qualified" for the work, citing Alvarado v. Texas Rangers, 492 F.3d 605, 616 (5th Cir. 2007), a subjective assessment of a candidate's performance may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection so long as the employer can articulate "a clear and reasonably specific basis for its subjective assessment." Id. (citing Burdine, 450 U.S. at 258). Here, LaFrance provided a clear and

---

[17] Plaintiff's analysis of the available work also does not address the many workers who were laid off from active jobs when work slowed, but were later recalled to the same project when activity picked up again. For example, a bricklayer like Robert Coates worked on the Brandon High School job up until his layoff on February 27, 2008. He was then recalled to the same job site on April 2, 2008. (See Def. Answers to Plaintiff's Third Set of Interrogs. at 7; Pl. Resp. to Mot. for Summ. J. Ex. J Mason 408-415.)

specific basis for his decision to layoff Plaintiff from the ITC job and not to recall him to the next job for which LaFrance was foreman.  To the extent that Plaintiff argues that he *was* sufficiently skilled to work specifically on the Conner Creek Academy job, this amounts to nothing more than his disagreement with the business judgment of his employer.  See Hein v. All America Plywood Co., Inc., 232 F.3d 482, 490 (6th Cir. 2000) (soundness of employment decision may not be challenged as a means of showing pretext).  With respect to Plaintiff not being recalled to other jobs more generally, Mark Butscher testified that he did not recall Plaintiff because there were fewer jobs overall, no foreman specifically requested Plaintiff, and by the first quarter of 2008, Butscher was under the impression that Plaintiff had already or would soon retire.  Plaintiff does not dispute that he essentially gave up calling Mark Butscher in January and February 2008, though Butscher testified that employees on layoff seeking work typically called every day.  L&H also provided the testimony of at least two other employees who were under a similar impression that Plaintiff planned to retire.   Taken together, this is a clear and specific basis for the decision not to recall Plaintiff.

Plaintiff's argument that L&H's answer to the interrogatory proves the illegitimacy of the company's stated reasons for laying Plaintiff off is not supported by the record.  L&H's answer was filed in response to an interrogatory seeking information about a "workforce reduction plan."  L&H does not have such a plan.  Rather, layoffs are commonplace when work slows and left up to the discretion of foremen on specific jobs, as work winds down and other work becomes available.  The parties do not dispute that

individuals are laid off as work winds down, sometimes reducing a crew to a few workers to complete a job, depending in part on the foreman's discretion.  Thus, the fact that L&H could not respond to a question about Plaintiff's layoff as it related to an overall "workforce reduction plan" does not itself cast doubt on the company's other clearly articulated reasons.

Plaintiff also argues that the fact that L&H's reasons for failing to recall Plaintiff have shifted or changed over the course of the litigation indicates that those reasons are pretextual.  The Sixth Circuit has held that an employer's shifting rationale can be evidence of pretext.  Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002).  However, in this case, L&H's proffered reasons did not shift.  Instead, different reasons were given regarding different aspects of the layoff/recall process.  First, Mark LaFrance testified that he decided to lay off Plaintiff from the ITC job because it was slowing down and he no longer needed a full crew.  His subsequent decision not to recall Plaintiff to Conner Creek was motivated by a slightly different reason, as dictated by the different demands of the new jobsite.  Mark Butscher, the only other main decisionmaker involved in the at-issue employment decision, testified that he did not recall Plaintiff to any other job because the company was experiencing an overall slowdown.  Viewed in light of the overall layoff/recall process, each individual's testimony is internally consistent and responsive to the company's concerns in different circumstances.  Finally, the more generalized statements about L&H's lack of work from Harman or others within

the company do no contradict the foregoing testimony.  Rather, they explain the context in which Plaintiff's layoff—along with dozens of others' layoffs—occurred.

The foregoing demonstrates that L&H's stated reasons for laying Plaintiff off and failing to recall him were not pretext for age discrimination.   Plaintiff has not carried his burden of show that age was the 'but-for' cause of the employer's adverse decision, and accordingly he has failed to establish that he was terminated because of his age under the ADEA.

**D.      ELCRA**

Plaintiff also claims that his layoff and L&H's subsequent failure to recall him from layoff violates the Elliott-Larsen Civil Rights Act.  The ELCRA prohibits an employer from discriminating against an employee on the basis of age.  Mich. Comp. Laws § 37.2202(1)(a).  ELCRA claims are analyzed under the same standards as federal ADEA claims.  See Geiger, 579 F.3d at 626; Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2007).  Because Plaintiff has failed to present evidence sufficient to establish a *prima facie* ADEA claim, he has similarly failed to establish a *prima facie* case under the ELCRA.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion for summary judgment [**Dkt. # 27**] is GRANTED.

IT IS FURTHER ORDERED that this case is DISMISSED, with prejudice.


                                        s/Gerald E. Rosen
                                        Gerald E. Rosen
                                        Chief Judge, United States District Court

Dated:  February 17, 2010



I hereby certify that a copy of the foregoing document was served upon counsel of record on
February 17, 2010, by electronic and/or ordinary mail.

                                        s/Ruth A.Gunther
                                        Case Manager
                                        (313) 234-5137